## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| JOSEPH L. HERROD and,<br>CAESAREA-DEVELOPMENT,<br>LLP, | ) ) ) | |
| | ) | |
| **Realigned Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Case No:2:15-cv-00152-WHA-SRW |
| | ) | |
| JACKSON HEALTH, INC.;<br>DONALD P. BROBST; C. DENNIS<br>WOOLDRIDGE; A. CHANDLER<br>MULLER; JACKSON HOSPITAL<br>& CLINIC, INC.; PRIMARY<br>PHYSICIANS, INC., | ) ) ) ) ) ) | |
| | ) | |
| **Realigned Defendants.** | ) | |

---

## AMENDED COMPLAINT OF
## REALIGNED PLAINTIFFS JOSEPH L. HERROD AND
## CAESAREA-DEVELOPMENT, LLP

---

COME NOW the realigned plaintiffs Joseph L. Herrod and Caesarea-Development, LLP, and, pursuant to this Court's order (Doc. #21), hereby state their claims against the realigned defendants as follows:

## RELEVANT PARTIES

1.     Realigned plaintiff Joseph L. Herrod ("Herrod") is an individual, over the age of majority in the State of Alabama, and a resident of the State of Florida. Herrod is a citizen of Florida for diversity jurisdiction purposes.

2.     Realigned plaintiff Caesarea Development, LLP ("CD") is a Delaware limited liability partnership whose partners are Joseph L. Herrod and Reynold Yordy.  CD is a citizen of Florida and Tennessee for diversity jurisdiction purposes.

3.     Non-party Reynold Yordy ("Yordy") is an individual, over the age of majority in the State of Alabama, and a resident of the State of Tennessee. Yordy is a citizen of Tennessee for diversity jurisdiction purposes

4.     Non-party Alkemi Management, LLC ("Alkemi") is a Florida limited liability company whose current members are Herrod and Yordy.

5.     Realigned defendant Jackson Health, Inc. ("JHI") is an Alabama corporation upon information and belief wholly owned and operated by Jackson Hospital & Clinic, Inc. d/b/a Jackson Hospital and located in Montgomery, Alabama.  JHI is a citizen of Alabama for diversity purposes.

6.     Realigned defendant Donald P. Brobst ("Brobst") is an individual, over the age of majority in the State of Alabama, and a resident of the State of Alabama. Brobst is a citizen of Alabama for diversity purposes.

7.     Realigned defendant A. Chandler Muller ("Muller") is an individual, over the age of majority in the State of Alabama, and a resident of the State of Alabama. Muller is a citizen of Alabama for diversity purposes.

8.      Realigned defendant C. Dennis Wooldridge ("Wooldridge") is an individual, over the age of majority in the State of Alabama, and a resident of the State of Alabama. Wooldridge is a citizen of Alabama for diversity purposes.

9.      Realigned defendant Primary Physicians, Inc. f/k/a PriMed Physicians, Inc. ("PPI") is an Alabama corporation with its principal place of business in Montgomery, Alabama.  PPI is a citizen of Alabama for diversity purposes.

10.      The shareholders of PPI are Herrod, Brobst, Muller and Wooldridge.

11.      Realigned defendant Jackson Hospital & Clinic, Inc. ("Jackson Hospital") is an Alabama non-profit corporation with its primary place of business in Montgomery, Alabama.  Jackson Hospital is a citizen of Alabama for diversity purposes.

12.      Non-party Central Alabama Primary Care Specialists, LLC ("CAPCS") is an Alabama limited liability company whose members are PPI and JHI.

13.      Non-party Caesarea-Millbrook, LLC ("Millbrook") is a limited liability company formed under the laws of the State of Alabama. Millbrook is not named as party to this dispute because there are no claims asserted against or on behalf of Millbrook, only claims between its members relating to the control of Millbrook and its assets.

14.      Non-party Caesarea-Chantilly, LLC ("Chantilly") is a limited liability company formed under the laws of the State of Alabama. Chantilly is not named as

party to this dispute because there are no claims asserted against or on behalf of Chantilly, only claims between its members relating to the control of Chantilly and its assets.

15.    Interpleader and non-party Sterling Bank (the "Bank") is a division of Synovus Bank, a national banking association, which is based in Columbus, Georgia.

## JURISDICTION

16.    The realigned plaintiff, Herrod, is a citizen of Florida for the purposes of diversity jurisdiction.

17.    The realigned plaintiff, CD, is a citizen of Florida and Tennessee for diversity jurisdiction purposes.

18.    The realigned defendants, Brobst, Muller, Wooldridge, JHI, PPI and Jackson Hospital, are all citizens of Alabama for the purposes of diversity jurisdiction.

19.    Although irrelevant to the diversity analysis in this situation, as a national banking association with its principal place of business in Columbus, Georgia, the Bank is a citizen of Georgia for diversity jurisdiction purposes. *See, e.g., Blake v. Bank of America, N.A.*, 2011 WL 2650849 at *1 n.1 (M.D. Ala. 2011) (a national banking association is a citizen of the state in which it is located, and it is located in the state designated in its articles of association as its main office).

20.     There is complete diversity between the parties.

21.     The dispute involves damages exceeding $75,000.00.

22.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332.

23.     The dispute involves wrongdoing by the defendants within the Northern Division of the Middle District of Alabama.

24.     Venue is proper in the Northern Division of the Middle District of Alabama.

## FACTUAL BACKGROUND

### *The business of PPI*

25.     From 2010 to 2014, as the CEO of PPI, Herrod managed the medical practice of Drs. Brobst, Muller, and Wooldridge.

26.     PPI operated between three and five emergency care facilities (depending on the time at issue) and two specialty care health care facilities located in and around Montgomery, Alabama.

27.     Herrod, Brobst, Muller and Wooldridge each own 25% of the shares of PPI (4 shares each).

28.     Each of the shareholders of PPI was employed by PPI: Herrod as CEO, and the three physicians as the medical directors of the PPI facilities.

### *Business problems at PPI, and Herrod's solutions*

29.    In 2010, when Herrod was brought in by PPI, PPI's business future was at serious risk due to the passage of the Affordable Care Act, the lack of a long-term lease for the PPI facilities, the lack of any independent branding for PPI's business, competitors beginning to enter the Montgomery market, and the lack of investment into long-term infrastructure.

30.    Herrod orchestrated a new lease with PPI's landlord, Baptist Health Montgomery, on terms favorable to PPI; renovated all of PPI's urgent care clinics; set in place new operational quality expectations; purchased two pieces of property for new PPI facilities; implemented a better and more efficient revenue-cycle system; and shepherded a dissident shareholder out of PPI.

31.    At no time during this period did the owners of PPI express any dissatisfaction with Herrod's management.

32.    In fact, in April 2013, the shareholders of PPI voted to increase Herrod's compensation to the highest amount available under Herrod's contract with PPI.

### *Herrod and Yordy's goals in becoming involved with PPI*

33.    When Herrod and Yordy, became involved with PPI, they made clear that their intentions were initially to help alleviate the then-current problems at PPI, and then to begin expanding the "All Med" brand and business in the Montgomery

market, as well as into other markets.  "All Med" was the brand name Herood and Yordy brought to PPI to use for the business.

34.     To this end, from 2011 through 2014, Herrod and Yordy (and later their new company, Alkemi) invested significant time and resources into creating and putting into place certain contracts, building technology, as well as fine-tuning operations of PPI (and then CAPCS) in order to build a scalable platform upon which the business of PPI (and then CAPCS) could be grown and expanded in Montgomery and into other markets.

35.     As an example of the investment of time, energy and money, Yordy worked for 13 months without salary when he first became involved with PPI. Yordy was willing to work under these conditions because Herrod and Yordy (and later, Alkemi) viewed their time and effort into PPI as an investment into the future expansion of the business.

### *Baptist Health Montgomery terminates PPI's lease(s)*

36.     In December 2013, PPI was given 120 days' notice from its landlord (Baptist Health Montgomery) that the PPI lease previously negotiated by Herrod for the PPI facilities would not be renewed. The lease was non-renewed because Baptist Health wanted more control and "ownership" over its primary care physicians. Brobst, Muller and Wooldridge wanted to avoid any control over their practice by Baptist Health, so they asked Herrod to find a solution.

37.     The plan proposed by Herrod at that time was to move the PPI facilities to new locations. Herrod explained to the doctors that, as a part of this proposed plan, an infusion of capital would be required. The doctors agreed to the plan.

38.     As a result of the implementation of this plan, PPI was in desperate need of an additional capital infusion in 2014 to continue operation of its business, including the following capital needs: working capital for operations, marketing, accounting, and legal expenses; tenant improvement and transition expenses for new facilities in the Montgomery market; and expansion into new locations in Chantilly and Millbrook, Alabama.

39.     At this same time, Jackson Hospital, the direct competitor of Baptist Health, was in dire need of expansion in the Montgomery market, new primary care physicians, and referrals of new patients to the hospital and its diagnostic services.

### Herrod negotiates a deal with Jackson Hospital

40.     Using his expertise, knowledge and know-how, Herrod negotiated a deal on behalf of PPI with Jackson Hospital whereby Jackson Hospital infused needed capital to PPI, and PPI provided to Jackson Hospital an expanded market, primary care physicians, and new referrals.

41.     From the very beginning of negotiations, Jackson Hospital was interested in the number of patients that would be directed to Jackson Hospital instead of its primary competitor, Baptist Health. All of the discussions with Jackson

Hospital's board and executives revolved around the potential revenue capture to Jackson Hospital of redirecting patients referred by PPI to Jackson Hospital instead of hospitals owned by Baptist Health. None of the discussions with Jackson Hospital's board or executives related to the potential profitability (or lack thereof) of the new venture with PPI.

42.     By virtue of Herrod's locating and negotiating this deal, PPI and Jackson Hospital reached an agreement in mid-to-late 2014 whereby PPI agreed to contribute its assets into a new entity (CAPCS), and Jackson Hospital agreed to infuse additional capital to that new entity. This deal was signed and documented on September 30, 2014.

43.     As a part of this deal, CAPCS was formed in order to operate the business formerly operated by PPI.

44.     The members of CAPCS are PPI (71.6%) and the wholly owned special purpose entity created by Jackson Hospital to enter into this deal, JHI (28.4%).

45.     Alkemi was also formed as part of the September 30, 2014 transaction. Alkemi was created (1) to manage CAPCS, including providing day-to-day business management services, accounting services, technology services and any other non-medical services needed by CAPCS; (2) connect the additional capital from Jackson Hospital needed by PPI with Jackson Hospital's need for additional primary care physicians and referrals together with PPI; and (3) to allow for additional expansion

of the business model utilized by PPI/CAPCS and Alkemi within the Montgomery market and to other cities and states.

46.    As a part of this deal, Alkemi was required to transition all PPI information and systems, including its accounting system, to a new format in order to enable CAPCS to utilize that information in the new CAPCS systems. The pre-existing PPI accounting system was no longer supported by its vendor, so Alkemi purchased and began the implementation of a new, more robust, accounting system. The implementation of this new system required at least 120 days to complete. Alkemi also instituted a similar plan to implement a new payroll/human resource management system.

47.    As of September 30, 2014, within nine months from PPI receiving the notice from Baptist Health of its intent to terminate PPI's lease, Herrod managed to ensure the survival of PPI by: (1) replacing PPI's outdated clinics with state of the art new clinics; (2) directing and implementing a marketing campaign that redirected all PPI patients to the new locations; (3) seeking out and negotiating a deal to infuse cash into PPI; (4) making certain the owners of PPI remained the majority members of the newly created entity; and (5) driving significant business to Jackson Hospital and away from Baptist Health's hospital (to the benefit of Jackson Hospital).

### *The Management Agreement*

48.     In order to document the agreement between CAPCS and Alkemi, those parties entered into a Management Agreement and a License Agreement, both dated September 30, 2014.

49.     Because Alkemi put forth a great deal of effort on the front-end of the Management Agreement, including extensive use of the skills, knowledge and money of Herrod and Yordy, as well as making available to CAPCS certain Alkemi-owned software, data, information and systems, the Management Agreement provided for a guaranteed term of three (3) years.

50.     This guaranteed term was intended to allow Alkemi, Herrod and Yordy to obtain over the course of the Management Agreement the benefit of the bargain which Alkemi, Herrod and Yordy immediately conferred upon CAPCS. This guaranteed term allowed Alkemi to be fully paid over time instead of requiring a large sum up front from CAPCS.

51.     CAPCS may only terminate the Management Agreement by giving written notice to Alkemi of "breaches [by Alkemi] in a material manner any term, condition or undertaking" in the Management Agreement, or if Alkemi "breaches or fails to follow in a material manner any policy established or directive issued by the Board of Advisors of" CAPCS. Management Agreement at § 9.2.

52.   The Management Agreement further provides that CAPCS may terminate the agreement only if Alkemi "fails to cure such breach or default within 60 days after [Alkemi]'s receipt of written notice from [CAPCS] describing the occurrence and nature of the breach or default, or fails to submit a plan for curing the breach or default that is reasonably acceptable to [CAPCS] within such 60 day period and thereafter diligently and continuously proceeds to cure the breach or default pursuant to the plan if the breach or default cannot reasonably be cured within the 30 days of submitting the plan." <u>Management Agreement</u> at § 9.2(a).

### *PPI's financial troubles continue after Jackson Hospital deal*

53.   In December, 2014, a few months after reaching the deal with Jackson Hospital, Herrod informed Brobst, Muller, and Wooldridge that CAPCS was not profitable. This was a situation similar to that with CAPCS' predecessor, PPI.

54.   Herrod told the doctors that, in order to make CAPCS profitable, management and the doctors would need to make changes to adequately address the insufficient revenue and the large expenses of CAPCS. Among other action items need to turn around the cash flow, Herrod informed the doctors that they needed to keep staffing to affordable levels, eliminate underperforming services, increase patient volume to increase revenue, and that Herrod and the physicians needed to reduce their pay to decrease expenses.

55.     Brobst, Muller and Wooldridge flatly refused to take any cut in pay or any other action to reduce expenses. The doctors were also unwilling to take any action to increase patient volume.

### *Jackson Hospital and the doctors scheme to improperly oust Herrod*

56.     On January 12, 2015, Jackson Hospital's CEO, Joe Riley, requested that Alkemi provide to him financial reports related to CAPCS. Riley requested that the financial reports be provided "immediately." Riley had not made a request for financial reports in any of his numerous prior meetings or communications with Alkemi and/or Herrod.

57.     Jackson Hospital, JHI, Brobst, Muller, and Wooldridge were aware at the time this request was made, on January 12, 2015, that Alkemi was unable to provide the financial reports due to the ongoing transition in accounting software. The transition was set to be completed by the end of January.

58.     Four days after Jackson Hospital requested the financial reports, on Friday, January 16, 2015 at 4:30 p.m., Muller gave notice to Herrod via e-mail of a meeting of the Board of Advisors of CAPCS to take place the following Monday, January 19, 2015 at 5:00 p.m. Monday January 19, 2015 was a federal holiday.

59.     At the January 19, 2015 meeting, only 3½ months after signing the Management Agreement and License Agreement, and with no prior written or oral

notice of any problem or purported breach, the Board of Advisors of CAPCS improperly voted to terminate the Management Agreement with Alkemi.

60.    At that same meeting, the Board removed Herrod as manager of CAPCS and voted to hire Jackson Hospital to take over the management of CAPCS. Upon information and belief, this move was intended to guarantee referrals from CAPCS would go to Jackson Hospital and to ultimately permit Jackson Hospital to take control of CAPCS.

61.    The CAPCS Board also voted to hire Jackson Hospital's legal counsel (Gilpin Givhan) as its counsel.

62.    The Board of Advisors refused to give any reasoning or basis for any of its decisions during the January 19, 2015 meeting.

### *Rationale for the surreptitious actions*

63.    CAPCS's improper termination of the Management Agreement was, among other improper purposes, intended to permit CAPCS to obtain the benefit of significant work, work-product and efforts undertaken by Alkemi, Herrod and Yordy to turn around the business of PPI and negotiate the deal with Jackson Hospital to create CAPCS.

64.    After taking full advantage of the skills and connections of Alkemi, CD, Herrod and Yordy, the defendants sought to avoid payment for those services (which

were set forth in the Management Agreement) by improperly terminating Alkemi in order to allow the new owner, Jackson Hospital, to manage CAPCS's business.

65.    CAPCS also improperly terminated the Management Agreement in order to obtain the benefit of significant work-product and efforts undertaken by Alkemi, CD, Herrod and Yordy to create contracts, systems, information and technology in order to build a scalable platform upon which the business of CAPCS could be grown and expanded in Montgomery and into other markets.

66.    By terminating the Management Agreement in this manner, CAPCS took control of valuable information while avoiding the payment of any compensation to Alkemi for its (and CD, Herrod and Yordy's) investment in time, money and resources into PPI and then CAPCS over the prior four years.

### Continued plan of Jackson Hospital and the doctors

67.    Immediately following the meeting of the CAPCS Board of Advisors, on January 19 and 20, 2015, CAPCS began taking actions designed to prevent Alkemi from carrying out its obligations under the Management Agreement. Among other actions, CAPCS locked Alkemi out of its offices, declined access of Alkemi to any CAPCS financial data, took possession of all management files, confiscated all Alkemi, CD and related companies' accounting files, solicited Alkemi employees to begin working with CAPCS, bullied and harassed Alkemi employees into using their personal passwords and sign-in information to access Alkemi-owned and

controlled software and information, terminated the authority of Alkemi to access CAPCS accounts with banks and lenders, and solicited the vendors and software providers contracted with Alkemi.

68.     Following these actions by CAPCS, there was no possible way for Alkemi to correct any purported breach or problem under the Management Agreement (assuming there was any breach or problem and that Alkemi had been informed of any breach or problem). The actions of CAPCS also prevented Alkemi from continuing to manage the operations of CAPCS.

### *Belated written notice from CAPCS*

69.     On January 27, 2015, CAPCS belatedly provided its first written notice of any kind to Alkemi outlining the purported breach by Alkemi of the Management Agreement.

70.     This belated notice was a sham. The allegations are not true, and by the time CAPCS sent the January 27, 2015 letter, CAPCS had already breached the Management Agreement and shut out Alkemi from CAPCS.

71.     The actions of CAPCS on January 19-20, 2015 left Alkemi unable to fulfill its obligations to CAPCS.

72.     CAPCS failed to provide the written notice required by the Management Agreement prior to the wrongful termination.

73.     The January 27, 2015 purported notice did not contain any "material" breach by Alkemi, nor did it cite to any "material" policy or directive issued by the Board of Advisors which was not followed.

74.     Further, there was no failure by Alkemi to cure any breach or default, since CAPCS failed to give any notice of an alleged breach or default.

75.     There was no material breach of the Management Agreement by Alkemi.

76.     The purported breaches set forth in the January 27, 2015 letter from CAPCS were not material, and could have quickly and easily been cured by Alkemi if notice had been provided, as required under the Management Agreement.

77.     In fact, a good number of "solutions" to the issues raised by CAPCS in its letter were in progress already on January 19, 2015 as a part of the transition from PPI to CAPCS. This was known to the defendants.

78.     Despite the defendants' knowledge that their complaints were not material, were caused in part by the defendants themselves (*i.e.*, by agreeing to the change in accounting systems), and were in the process of being remedied,   CAPCS breached the Management Agreement, excluded Alkemi from any information relating to CAPCS and prevented Alkemi from curing those alleged defects.

### *Ownership and purpose of Millbrook and Chantilly*

79.     Millbrook and Chantilly were also created as a part of the deal between PPI and Jackson Hospital resulting in the creation of CAPCS and Alkemi.

80.     Millbrook and Chantilly were created to own, and subsequently develop, certain real property to be used for new clinics/locations for CAPCS.

81.     As a part of the deal with PPI, Jackson Hospital (through JHI) bought a majority interest in Millbrook and Chantilly. Following the deal, Millbrook and Chantilly were purportedly owned by JHI (80%), Brobst (5%), Muller (5%), Wooldridge (5%) and Herrod (5%).

82.     However, only JHI, Brobst and Herrod paid the required initial capital into the companies. Muller and Wooldridge refused or were unable to do so.

83.     Because Muller and Wooldridge failed or refused to provide any initial capital, they are not members of Millbrook or Chantilly.

84.     Millbrook and Chantilly each entered into a separate "Development Agreement" with CD to develop the real property to be owned by Millbrook and Chantilly, and used by CAPCS.

85.     Pursuant to the terms of the Development Agreements, both Millbrook and Chantilly were each required to pay to CD a development fee. Millbrook's fee was $250,000 and Chantilly's fee was $289,000. One-half of the development fee amounts (*i.e.*, $125,000 from Millbrook and $144,500 from Chantilly) were due to

CD upon the execution of the Development Agreements to represent work already performed by CD to prepare for the development of the new facilities.

86.     Neither Millbrook nor Chantilly made this initial development fee payment to CD.

87.     Millbrook and Chantilly also contracted with CD to purchase from CD the real property to be owned and developed by the entities.

88.     Neither Millbrook nor Chantilly purchased the real property for development from CD because neither has sufficient cash to pay the agreed-upon purchase price.

89.     Millbrook and Chantilly failed to make the required payment to CD and to purchase the real property because Muller and Wooldridge failed and/or refused to pay their share of the capital contributions to Millbrook and Chantilly, and because Jackson Hospital and/or JHI refused to provide a guaranty for the required loan on behalf of Millbrook and Chantilly.

90.     After improperly removing Herrod from his positions with CAPCS, defendants Jackson Hospital, JHI, Brobst, Muller and Wooldridge sought to remove CD and Herrod from their managerial roles with Millbrook and Chantilly.

91.     On February 3, 2015, Jackson Hospital, JHI, Brobst, Muller and Wooldridge purported to take action via written "approval and consent of members" on behalf of Millbrook and Chantilly to remove CD and Herrod. These defendants

claimed this action complied with Section 6.3 of the company agreements of Millbrook and Chantilly because the action was taken by members owning 95% of the membership interests of Millbrook and Chantilly.

92.     As a part of this effort, Jackson Hospital, JHI, Brobst, Muller and Wooldridge appointed Jackson Hospital (through JHI) as the manager of Millbrook and Chantilly.

93.     However, the action taken by Jackson Hospital, JHI, Brobst, Muller and Wooldridge was improperly taken and not in compliance with the company agreements of Millbrook or Chantilly.

94.     Because Muller and Wooldridge did not pay their capital contributions into Millbrook and Chantilly, as required in order to obtain membership interest in those entities, neither Muller nor Wooldridge are members of Millbrook or Chantilly.  Accordingly, the action purportedly taken on behalf of Millbrook and Chantilly was not performed with the consent of 95% of the membership interest of Millbrook and Chantilly, and, therefore, was not in compliance with their company agreements.

95.     Because the purported removal of Herrod and CD from the management of Millbrook and Chantilly was not done with the consent of the required 95% of the membership interests, that action is void.

96.     Since the removal of Herrod and CD was void, Herrod and CD remain the correct and proper parties to manage the operations and assets of Millbrook and Chantilly.

97.     Alternatively, if Muller and Wooldridge are considered to be members of Millbrook and Chantilly by Jackson Hospital and JHI despite their failure and refusal to provide fair value for their ownership interests, then Jackson Hospital and JHI seek to confer a benefit upon Muller and Wooldridge which was not earned by those physicians in violation of federal law.

### CLAIM 1 - Oppression/Squeeze-Out
### (Jackson Hospital, JHI, PPI, Brobst, Muller & Wooldridge)

98.     CD and Herrod hereby adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

99.     CD was duly elected as the manager of Millbrook and Chantilly, and Herrod was duly elected as the manager of CAPCS and the CEO of PPI.

100.   By unlawful means and for an unlawful purpose, Jackson Hospital, JHI, PPI, Brobst, Muller and Wooldridge have sought to oppress and squeeze-out Herrod and CD from their management positions with these entities.

101.   Jackson Hospital, PPI, Brobst, Muller and Wooldridge have affirmatively taken the following actions, among others, toward their goal of oppressing and squeezing out Herrod and CD: initiating a surreptitious plan to remove Herrod and CD from management; holding surreptitious and improper

21

meetings of entities intended to exclude Herrod and CD; failing and refusing to permit Herrod and CD to participate in the management of the entities; failing and refusing to disclose any information regarding the companies to Herrod; terminating all employment of Herrod with the entities, while retaining employment for all other members/shareholders; and engaging Jackson Hospital to manage CAPCS.

102.  Herrod and CD have been damaged by the wrongful oppression and squeeze-out undertaken by Jackson Hospital, JHI, PPI, Brobst, Muller and Wooldridge.

WHEREFORE, based upon the foregoing, Herrod and CD respectfully demand judgment in their favor based upon the wrongdoing of Jackson Hospital, JHI, PPI, Brobst, Muller and Wooldridge, and further demand an award of compensatory and punitive damages, as well as attorney fees and costs.

## CLAIM 2 - Misrepresentation
### (Jackson Hospital, JHI, Brobst, Muller & Wooldridge)

103.  CD and Herrod hereby adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

104.  Jackson Hospital, JHI, Brobst, Muller and Wooldridge falsely represented to CD and Herrod their intent in: (a) creating CAPCS; (b) entering into the Management Agreement and License Agreement; (c) entering into the operating agreements for CAPCS, Millbrook and Chantilly; (d) entering into the Development Agreement between CD and Millbrook and Chantilly; and (e) entering into all other

documents purportedly intended to govern the relationship of the parties to each other.

105.   CD and Herrod reasonably relied upon these representations to invest time and money into the proposed purchase of real property by Millbrook and Chantilly.

106.   CD and Herrod reasonably relied upon these representations to invest time and money into the management and operation of PPI and CAPCS, including Herrod acting in his role as manager of CAPCS and as CEO of PPI.

107.   Contrary to their representations, Jackson Hospital, JHI, Brobst, Muller and Wooldridge colluded and conspired with the Bank to interplead only those accounts held by the Bank which would not directly harm Jackson Hospital, JHI, Brobst, Muller and Wooldridge (*i.e.*, the accounts of Millbrook and Chantilly, and not those of PPI and CAPCS).

108.   Contrary to their representations, Jackson Hospital, JHI, Brobst, Muller and Wooldridge surreptitiously created a scheme to oust Alkemi, CD and Herrod from their managerial positions with Millbrook, Chantilly, PPI and CAPCS.

109.   Herrod reasonably relied upon the representations of Jackson Hospital, JHI, Brobst, Muller and Wooldridge to his detriment.

110.   The misrepresentations by Jackson Hospital, JHI, Brobst, Muller and Wooldridge have resulted in damages to CD and Herrod.

WHEREFORE, based upon the foregoing, CD and Herrod respectfully demand judgment in their favor based upon the wrongdoing of Jackson Hospital, JHI, Brobst, Muller and Wooldridge, and further demand an award of compensatory and punitive damages, as well as attorney fees and costs.

## CLAIM 3 - Suppression
### (Jackson Hospital, JHI, Brobst, Muller & Wooldridge)

111.   CD and Herrod hereby adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

112.   Jackson Hospital, JHI, Brobst, Muller and Wooldridge had an obligation to disclose to CD and Herrod their intended plans to use the information and knowledge of Alkemi, CD, Herrod and Yordy for their own benefit and then improperly terminate all relationships with Alkemi, CD, Herrod and Yordy.

113.   Jackson Hospital, JHI, Brobst, Muller and Wooldridge suppressed their intent to utilize the knowledge and efforts of Alkemi, CD, Herrod and Yordy, then refused to pay for those services.

114.   Jackson Hospital, JHI, Brobst, Muller and Wooldridge further suppressed their intent not to abide by: (a) the terms of the parties' agreements to govern the management of Millbrook and Chantilly; (b) the terms of the parties' agreements governing the relationship between the parties, such as the various entities' operating agreements; and (c) the terms of agreement between CD, Millbrook and Chantilly.

115.   CD and Herrod reasonably relied upon Jackson Hospital, JHI, Brobst, Muller and Wooldridge's failure to disclose the suppressed information to invest time and money into the creation, operation and management of PPI and CAPCS, and into the proposed purchase of real property by Millbrook and Chantilly.

116.   CD and Herrod were damaged by the suppressions of Jackson Hospital, JHI, Brobst, Muller and Wooldridge.

WHEREFORE, based upon the foregoing, CD and Herrod respectfully demand judgment in their favor based upon the wrongdoing of Jackson Hospital, JHI, Brobst, Muller and Wooldridge, and further demand an award of compensatory and punitive damages, as well as attorney fees and costs.

## CLAIM 4 - Breach of Contract
### (JHI, Brobst, Muller and Wooldridge)

117.   CD and Herrod hereby adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

118.   JHI, Brobst, Muller and Wooldridge entered into various operating agreements with Herrod intended to govern the management and operations of CAPCS and PPI.

119.   Herrod has performed his duties and obligations under the operating agreements.

120.   JHI, Brobst, Muller and Wooldridge have breached the terms of the agreements by improperly attempting to remove Herrod as manager of CAPCS and as CEO of PPI.

121.   The result of these actions taken by JHI, Brobst, Muller and Wooldridge is damage to Herrod, as well as damage to CAPCS and PPI.

WHEREFORE, based upon the foregoing, CD and Herrod respectfully demand judgment in their favor based upon the wrongdoing of JHI, Brobst, Muller and Wooldridge, and further demand an award of compensatory damages, as well as attorney fees and costs.

### CLAIM 5 - Breach of Contract
### (Jackson Hospital, JHI, Brobst, Muller & Wooldridge)

122.   CD and Herrod hereby adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

123.   JHI, Brobst, Muller and Wooldridge entered into various operating agreements with Herrod and CD intended to govern the management and operations of Millbrook and Chantilly.

124.   Herrod and CD have performed their duties and obligations under the operating agreements.

125.   JHI, Brobst, Muller and Wooldridge have breached the terms of the agreements by failing to contribute capital to Millbrook and Chantilly, as required, and improperly attempting to remove CD as manager of Millbrook and Chantilly.

126.   Millbrook and Chantilly also entered into agreements with CD to develop certain properties to be owned by Millbrook and Chantilly.

127.   As a part of those agreements, Millbrook and Chantilly were to purchase the real property from CD.

128.   However, Millbrook and Chantilly have been unable to purchase the properties from CD as a result of the failure and refusal of Muller and Wooldridge to contribute any capital to Millbrook or Chantilly, and the failure of Jackson Hospital and JHI to provide a guaranty for a necessary loan.

129.   Millbrook and Chantilly were further required to pay the first half of the development fee due to CD upon entering into the agreements with CD.

130.   Millbrook and Chantilly have yet to make any payments to CD as a result of the failure and refusal of Muller and Wooldridge to contribute any capital to Millbrook or Chantilly, and the failure of Jackson Hospital and JHI to provide a guaranty for a necessary loan.

131.   Herrod and CD have performed their duties and obligations under the various agreements.

132.   The result of these actions taken by Jackson Hospital, JHI, Brobst, Muller and Wooldridge is damage to CD, as well as damage to Millbrook and Chantilly.

WHEREFORE, based upon the foregoing, CD and Herrod respectfully demand judgment in their favor based upon the wrongdoing of Jackson Hospital, JHI, Brobst, Muller and Wooldridge, and further demand an award of compensatory damages, including, without limitation, the award of the required overdue development fee, as well as attorney fees and costs.

## CLAIM 6 - Breach of Employment Contract
### (PPI)

133.   CD and Herrod hereby adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

134.   PPI entered into an Employment Agreement with Herrod whereby PPI agreed to employ Herrod as CEO and to pay to Herrod an annual salary plus bonus.

135.   Although Brobst, Muller and Wooldridge have surreptitiously sought to squeeze-out Herrod from any role with PPI, they have not terminated his employment as CEO.

136.   At the direction of CAPCS, Brobst, Muller and Wooldridge, PPI has failed and refused to pay to Herrod the salary due to him for his employment as CEO of PPI.

137.   Herrod fulfilled all of his obligations pursuant to the Employment Agreement, until barred from doing so by the actions of CAPCS, Brobst, Muller and Wooldridge.

138.   The failure of PPI to pay the salary owed to Herrod has damaged Herrod.

WHEREFORE, based upon the foregoing, Herrod respectfully demands judgment in his favor based upon the breach of contract by PPI, and further demands an award of compensatory damages, as well as attorney fees and costs.

### CLAIM 7 - Interference with Contractual or Business Relations
### (Jackson Hospital & JHI)

139.   CD and Herrod hereby adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

140.   CD and Herrod had contracts and/or business relationships with Alkemi, PPI, Millbrook, Chantilly, Brobst, Muller and Wooldridge, as well as with employees and suppliers/vendors of Alkemi.

141.   Jackson Hospital, JHI and their agents knew of those contracts and business relationships.

142.   Jackson Hospital and JHI were not a party to the contracts or business relationships between Herrod and CD and Alkemi, PPI, Brobst, Muller and/or Wooldridge, nor with any of the employees and suppliers/vendors of those persons or entities.

143.   Jackson Hospital and JHI were not agents of or related to anyone involved in those contractual or business relationships.

144.   Jackson Hospital and JHI intentionally disrupted or interfered with the performance of those contracts and business relationships by orchestrating the improper termination of the Management Agreement and the squeeze-out of Herrod from PPI, CAPCS, Millbrook and Chantilly.

145.   As a result of the actions of Jackson Hospital and JHI, Herrod and CD have suffered damages.

WHEREFORE, based upon the foregoing, CD and Herrod respectfully demand judgment in their favor based upon the wrongdoing of Jackson Hospital and JHI, and further demand an award of compensatory and punitive damages, as well as attorney fees and costs

## CLAIM 8 - Civil Conspiracy
## (Jackson Hospital, JHI, PPI, Brobst, Muller & Wooldridge)

146.   CD and Herrod hereby adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

147.   In combination with the Bank, CAPCS and others unknown at this time, the defendants PPI, Jackson Hospital, JHI, Brobst, Muller and Wooldridge, conspired to perform the above-stated improper and unlawful activities.

148.   The actions of PPI, Jackson Hospital, JHI, Brobst, Muller and Wooldridge caused damage to Herrod and CD.

WHEREFORE, based upon the foregoing, CD and Herrod respectfully demand judgment in their favor based upon the wrongdoing of PPI, Jackson

Hospital, JHI, Brobst, Muller and Wooldridge, and further demand an award of compensatory and punitive damages, as well as attorney fees and costs.

<u>JURY DEMAND</u>

CD and Herrod respectfully demand a trial by jury on all claims.

        */s/ John W. Clark IV*
        COUNSEL

        Respectfully submitted,

        */s/ John W. Clark IV*
        BRUCE F. ROGERS (ROG010)
        JOHN W. CLARK IV (CLA087)
        BAINBRIDGE, MIMS, ROGERS & SMITH, LLP
        The Luckie Building, Suite 415
        600 Luckie Drive (35223)
        Post Office Box 530886
        Birmingham, Alabama 35253
        Telephone:  205-879-1100
        Facsimile:  205-879-4300
        Email:      brogers@bainbridgemims.com
                      jclark@bainbridgemims.com

        **Attorneys for realigned plaintiffs**
        **Caesarea Development, LLP and Joseph**
        **L. Herrod**

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that, on   May 13, 2015   , a true and correct copy of this pleading has been served upon the following parties via the district court's CM/ECF electronic filing system and/or electronic mail:

Dennis R. Bailey
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
Post Office Box 270
Montgomery, Alabama 26101-0270
drb@rushtonstakely.com

John W. Weiss
Robert E.L. Gilpin
Simeon F. Penton
GILPIN GIVHAN
Post Office Drawer 4540
Montgomery, Alabama 36103-4540
jweiss@gilpingivhan.com
rgilpin@gilpingivhan.com
spenton@gilpingivhan.com

Tabor R. Novak, Jr.
BALL, BALL, MATTHEWS & NOVAK, P.A.
Post Office Box 2148
Montgomery, Alabama 36102
tnovak@ball-ball.com

                                        /s/ John W. Clark IV
                                       Of Counsel