IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| STERLING BANK, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 2:15-cv-152-WHA |
| v. | ) | |
| | ) | |
| CAESAREA-MILLBROOK, LLC, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER TO AMENDED COMPLAINT AND COUNTER-CLAIMS

## BY DEFENDANTS OTHERTHAN JACKSON HOSPITAL & CLINIC and JHI

Come now Dr. Donald P. Brobst ("Brobst"), Dr. C. Dennis Wooldridge ("Wooldridge"), Dr. A. Chandler Muller ("Muller"), Primary Physicians, Inc. ("PPI"), Caesarea-Millbrook, LLC ("Millbrook") and Caesarea-Chantilly, LLC ("Chantilly"), and for answer to the Amended Complaint set forth as follows:

### (ADMISSIONS AND DENIALS)

1. They admit that Joseph L. Herrod ("Herrod") is over the age of majority in the State of Alabama. However they have insufficient information to admit or deny the current residence or citizenship of Herrod.

2. They admit that Caesarea Development, LLP ("CD"), is a Delaware limited liability partnership. However they have insufficient information to admit or deny the identity of all of the partners of CD or their citizenship or residency.

3. They admit that Reynold Yordy ("Yordy") is over the age of majority in Alabama. However, they have insufficient information to admit or deny the residence or citizenship of Yordy.

4. They admit Alkemi Management, LLC ("Alkemi"), is a Florida limited liability company. However, they affirmatively assert that the current members of Alkemi are Herrod, Yordy, Muller, Brobst and Wooldridge.

5. They admit on information and belief that Jackson Health, Inc. ("JHI"), is a corporation the sole shareholder of which is Jackson Hospital & Clinic, Inc. ("Jackson"), an Alabama non-profit corporation located in Montgomery, Alabama. They otherwise deny the allegations of Paragraph 5.

6. Admitted.

7. Admitted.

8. Admitted.

9. Admitted.

10. Admitted.

11. Admitted.

12. Admitted.

13. Caesarea-Millbrook, LLC ("Millbrook"), is an Alabama limited liability company which was and is named as a defendant in the Interpleader and has not been dismissed from this cause. It admits that no claims are asserted against it in the Amended Complaint. It asserts an interest in the outcome of this cause.

14. Caesarea-Chantilly, LLC ("Chantilly"), is an Alabama limited liability company which was and is named as a defendant in the Interpleader and has not been dismissed from this

cause. It admits that no claims are asserted against it in the Amended Complaint. It asserts an interest in the outcome of this cause.

15.    Admitted.

16-17. They have insufficient information to admit or deny the allegations of paragraphs 16 and 17 of the Amended complaint.

18.    Admitted.

19.    They deny that the citizenship of Sterling Bank is irrelevant to the issue of diversity jurisdiction. Otherwise admitted.

20-22. They do not contest jurisdiction herein.

23.    Denied.

24.    They do not contest venue herein.

25.    They admit that Herrod was CEO of PPI. The term "managed the medical practice" is unclear and without definition; thus, these defendants demand strict proof thereof.

26.    They admit that PPI operated, at different times, up to as many as four clinics located in and around Montgomery, Alabama, between the period 2010 and 2014. Otherwise denied.

27.    Admitted.

28.    They admit Herrod was employed by PPI as its CEO. Brobst, Muller and Wooldridge were Medical Directors of the PPI facilities and some were employees for some of the period and independent contractors for some of the period.

28.    They admit that PPI, like other business entities of similar description, faced certain business challenges in 2010. They deny that those challenges are accurately and completely stated in Paragraph 28; thus, they demand strict proof thereof.

30.   They deny that paragraph 30 accurately, completely, and truthfully recites the actions of Herrod while CEO of PPI during the period in question.

31.   Denied.

32.   Denied.

33.   They deny any involvement by Yordy with PPI. They otherwise state that the intentions of Herrod are not accurately, truthfully, and completely set out in Paragraph 33; thus, denied.

34.   They deny the allegations of Paragraph 34 as to Yordy as he had no relationship with PPI and/or Alkemi. They admit that Herrod, in his capacity as CEO of PPI, was employed to perform certain duties and that he was fully compensated for any accomplishments he achieved for PPI. To the extent that he performed any duties for Central Alabama Primary Care Specialists, LLC ("CAPCS"), those duties would have been compensated by CAPCS in the form of payments of the Alkemi management fee. They otherwise deny the allegations of Paragraph 34.

35.   They deny that Yordy had any legal relationship with PPI and/or CAPCS. They believe Yordy was employed elsewhere for a significant portion of the 13 month period.  To the extent that Yordy may have invested time, energy or money as alleged in the Amended Complaint, he did so either as a volunteer, for his own personal benefit, or because of the relationship he had with Herrod rather than with any of the defendants.

36.   They admit that in 2013, PPI was given notice from its landlord, Baptist Health, that it would not renew certain leases which it held with PPI. They otherwise deny the allegations of Paragraph 36 of the Complaint.  They believe that Herrod's contentious relationship with Baptist Health caused Baptist Health to terminate the lease agreements.

37.     In light of the fact that Baptist Health had refused to renew the leases of PPI, due in part to the contentious and adversarial relationship between Herrod and Baptist Health, PPI had no option other than to find new locations for its business, and thus PPI and the defendant physicians agreed to the plan and to the infusion of capital to the extent that it was reasonable and necessary. They believe that a significant amount of capital (which Herrod indicated to be in excess of $800,000) was spent by PPI at the direction of Herrod to develop the AllMed brand.

38.     They admit that due to the termination of these leases, caused in whole or in part by the contentious conduct of Herrod, certain capitalization of the business entities was required. They otherwise deny the allegations of Paragraph 38 of the Amended Complaint.

39.     Denied

40.     They admit that as a result of negotiations in which Herrod participated, CAPCS was formed. They otherwise deny the allegations of Paragraph 40.

41.     Denied.

42.     They deny that Paragraph 42 of the Amended Complaint accurately and completely recites the contractual arrangements between Jackson Hospital and PPI. They admit that certain agreements were executed by certain of the parties hereto on the 30th day of September, 2014, wherein PPI agreed to contribute certain assets and Jackson Hospital agreed to contribute certain capital into the entity known as CAPCS.

43.     They admit that CAPCS was formed to operate urgent care centers, some of which were in locations formerly occupied by PPI. Otherwise denied.

44.     They admit that PPI is the owner of 70.59% of CAPCS and that 29.41% of CAPCS is owned by JHI. Otherwise denied.

45.     They admit that Alkemi was formed on or about the 17th day of September, 2014, and that on the 30th day of September, 2014, a Management Agreement was entered between Alkemi Management, LLC, and CAPCS. They deny that Paragraph 45 fully, accurately and truthfully sets out the terms and provisions of the Management Agreement; thus denied.  They deny that Alkemi owns the brand or technology.

46.     Denied.

47.     They deny the accomplishments of Herrod as CEO for PPI (for which he was fully paid in his capacity as CEO of PPI) are accurately, completely and truthfully recited in Paragraph 47. Thus, denied.

48.     They admit that CAPCS and Alkemi entered a Management Agreement and a License Agreement on the 30th day of September, 2014.

49.     Denied.

50.     Denied.

51.     Denied.

52.     They admit that a provision of the Management Agreement is quoted in Paragraph 52. Otherwise denied.

53.     They deny that Paragraph 53 accurately, completely and truthfully recites communications between Herrod, Brobst, Muller and Wooldridge. Thus, denied.

54.     They deny that Paragraph 54 accurately, completely and truthfully recites statements by Herrod. Thus, denied.

55.     Denied.

56.     They admit that Alkemi failed to prepare and furnish to CAPCS any financial statements and that the financial statements were requested but never furnished. Brobst, Muller and Wooldridge have no knowledge of any formal financials for PPI or CAPCS since 2012. Otherwise denied.

57.     Denied.

58.     They deny that Paragraph 58 accurately, completely and truthfully sets out the events made subject of Paragraph 58. Thus, denied.

59.     They admit that in a meeting conducted on or about the 19th day of January, 2015, the Board of Advisors of CAPCS, consistent with the terms and provisions of the CAPCS Limited Liability Company Agreement, approved the termination of the Management Agreement with Alkemi. They affirmatively assert that emails were sent to Herrod and his counsel on December 22, 2014, December 29, 2014, January 12, 2015, and January 14, 2015, regarding performance by Herrod and/or Alkemi of certain critical provisions of the Management Agreement. Otherwise denied.

60.     They admit that in the Board of Advisors meeting on or about the 19th day of January, 2015, the Board of Advisors of CAPCS, consistent with the terms of the CAPCS Limited Liability Company Agreement, voted to remove Herrod as manager of CAPCS. Otherwise denied.

61.     Admitted.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Denied.

66.   Denied.

67.   Denied.

68.   They admit that the breaches of Alkemi and the actions and inactions of Herrod were so egregious that there was no possible way for Alkemi or Herrod to have cured, with notice or otherwise, their breaches of contract and of fiduciary duties.

69.   Denied.

70.   Denied.

71.   Denied.

72.   Denied.

73.   Denied.

74.   Denied.  The breaches of Alkemi were so egregious they could not have been cured after notice or otherwise.

75.   Denied.

76.   Denied.

77.   Denied.

78.   Denied.

79.   They deny that the reasons and necessities for the creation of Millbrook and Chantilly are truthfully, accurately, and completely recited in Paragraph 79 of the Amended Complaint. Thus, denied.

80.   Admitted.

81.   They admit that JHI held a majority of the units of those entities described in the Amended Complaint as Millbrook and Chantilly, and that the percentages of ownership

of JHI, Brobst, Muller, Wooldridge, and Herrod are accurately recited in Paragraph 81. Otherwise denied.

82.    They would affirmatively assert that the required initial capitalization of Millbrook and Chantilly was fully and completely made on behalf of all of its members. Thus, denied.

83.    Denied. There has been no action taken to remove Muller and Wooldridge as members of Millbrook or Chantilly.

84.    Admitted.

85.    They deny that Paragraph 85 accurately, completely and truthfully recites the terms and provisions of the Development Agreements. Thus, denied.

86.    CD has neither earned nor is it entitled to any payments under the Development Agreements at this time. Thus, denied.

87.    Admitted.

88.    They admit that neither Millbrook nor Chantilly have become owners of the real property subject to the Purchase Agreements because their former manager, CD, failed to take the necessary actions to close the transactions. Otherwise denied.

89.    Denied.

90.    Denied.

91.    They admit that JHI, Brobst, Muller, and Wooldridge took action in accordance with the terms and provisions of the Company Agreements to remove Caesarea Development, LLP, as manager of the company. They deny the allegations as the same relate to Herrod.

92.    They admit JHI, Brobst, Muller and Wooldridge duly appointed Jackson Hospital & Clinic, Inc., manager of the companies. Otherwise denied.

93.    Denied.

94.     Denied.

95.     Denied.

96.     Denied.

97.     Denied.

98.     They incorporate herein by reference their responses to Paragraphs 1-97 above as is set out in full.

99.     Admitted as to CD's appointment as manager of Millbrook and Chantilly and Herrod's appointment as manager of CAPCS. Otherwise denied in that Herrod was employed as CEO of PPI.

100.    Denied.

101.    Denied.

102.    Denied.

103.    They incorporate herein by reference their responses to Paragraphs 1-97 above as is set out in full.

104.    Denied.

105.    Denied.

106.    Denied.

107.    Denied.

108.    Denied.

109.    Denied.

110.    Denied.

111.    They incorporate herein by reference their responses to Paragraphs 1-97 above as is set out in full.

00841177

112.    They had no such intentions. Thus, denied.

113.    Denied.

114.    They had no such intentions. Thus, denied.

115.    Denied.

116.    Denied.

117.    They incorporate herein by reference their responses to Paragraphs 1-97 above as is set out in full.

118.    Denied. Herrod had no Operating Agreement with Brobst, Muller, Wooldridge or JHI.

119.    Denied.

120.    Denied.

121.    Denied.

122.    They incorporate herein by reference their responses to Paragraphs 1-97 above as is set out in full.

123.    Denied. It is admitted that Millbrook and Chantilly entered certain agreements with CD.

124.    Denied.

125.    Denied.

126.    Admitted.

127.    Admitted.

128.    Denied.

129.    CD has neither earned nor is it entitled to the payment of any development fees under the terms and provisions of the applicable agreements. Thus, denied.

130.    Denied.

131     Denied.

132.    Denied.

133.    They incorporate herein by reference their responses to Paragraphs 1-97 above as is set out in full.

134.    They admit PPI employed Herrod as its CEO for good and valuable consideration. Otherwise denied.

135.    Denied.

136.    Denied.

137.    Denied.

138.    Denied.

139.    They incorporate herein by reference their responses to Paragraphs 1-97 above as is set out in full.

140.    CD and Herrod failed to describe or identify with any degree of particularity the contracts and/or business relationships to which they refer. Thus, denied.

141-145. The allegations of paragraphs 141-145 are not directed to these defendants but are denied on information and belief.

146.    They incorporate herein by reference their responses to Paragraphs 1-97 above as is set out in full.

147.    Denied.

148.    Denied.

## **FIRST DEFENSE**

1.      By the terms and provisions of the Management Agreement dated September 30, 2014, between Alkemi and CAPCS, all disputes which in any manner relate to that

Management Agreement, are subject to arbitration provisions. The Management Agreement sets out in pertinent part:

> 10.1   (a)   In case of a dispute, controversy or claim arising out of, relating to or in connection with this agreement, the owner and the manager (CAPCS and Alkemi respectively), as applicable, shall attempt in good faith to agree upon the rights of the respective parties with respect to each such claim within sixty (60) days of receipt of notice of such claim. If the parties should so agree, a memorandum setting forth such agreement shall be prepared and signed by the parties.
>
> (b)   If no such agreement can be reached after good faith negotiation lasting not longer than 60 days after the receipt of notice of such claim, either of the parties may demand binding arbitration of the matter unless the amount of the damage or loss is at issue in pending litigation with a third party, in which event arbitration shall not be commenced until such amount is ascertained or both parties agree to arbitration. Arbitration shall be administered by the American Health Lawyers Association (the "AHLA") pursuant to the AHLA Rules of Procedure for Arbitration and shall be conducted by either one or three neutral arbitrators having experience in the area of healthcare. Within 15 days of commencement of arbitration, the disputing parties shall attempt to agree on a single arbitrator. If they are unable to do so, within five (5) days each select one neutral qualified arbitrator. Within ten days of their appointment, the two neutral arbitrators so selected shall select the third neutral qualified arbitrator from a list of arbitrators provided by the AHLA having experience in the area of healthcare. The third arbitrator shall act as chair of the arbitration panel. If the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator, the third arbitrator shall be selected by the AHLA. The arbitrator(s) shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, adequate in the sole judgment of the arbitrator(s), to discovery relevant information from the opposing parties about the subject matter of the dispute. Any dispute regarding discovery, or the relevance or scope thereof, shall be determined by the single arbitrator or chair of the arbitration panel, as applicable, and shall be governed by the Federal Rules of Civil Procedure. The decision of the arbitrator(s) as to the validity and amount of any claim shall be binding and conclusive upon the parties to this Agreement. The award by the arbitrator(s) shall be in writing, shall be signed by the arbitrator(s) and shall include a statement of written findings of

fact and conclusions regarding the reasons for the disposition of any claim.

2.   All disputes of any nature which relate to the Management Agreement between Alkemi and CAPCS (including those that purportedly exist between Herrod and/or Alkemi and JHI, Brobst, Wooldridge and Muller) are due to be dismissed and referred to arbitration.

3.   To the extent that any claim stated in the Amended Complaint in any manner relates to the termination of the Management Agreement between Alkemi and CAPCS, to include those claims made against JHI, Brobst, Wooldridge and Muller, this Court lacks jurisdiction to consider the same as all such claims are due to be resolved by arbitration as provided in the Management Agreement as set out above.

## SECOND DEFENSE

1.   They are not guilty of the matters set out in the Amended Complaint.

2.   They plead the general issue.

3.   They have breached no duty lying in favor of CD or Herrod.

4.   No contract existed between these Brobst, Muller, Wooldridge, JHI, Jackson and Herrod or CD.

5.   PPI employed Herrod as an employee at will and breached no employment agreement with him.

6.   To the extent that any contract existed between Herrod and any of these defendants, any breach that occurred was on the part of Herrod.

7.   Neither CD nor Herrod has any right of recovery against these defendants.

## THIRD DEFENSE-OPRESSION/SQUEEZE OUT

1.   Contrary to the allegations complained in Claim 1, Herrod was not elected manager of PPI but was employed as CEO of that entity. His duties as CEO of PPI ceased upon the

execution of the Management Agreement between CAPCS and Alkemi on September 30, 2014. He was not squeezed out of that position by these defendants.

2.    Herrod was lawfully terminated as manager of CAPCS.

3.    CD was lawfully terminated as manager of Millbrook and Chantilly.

4.    The ownership interest of Herrod in Millbrook and Chantilly has not been altered, amended or terminated. Thus, he has neither been oppressed nor squeezed out of Millbrook or Chantilly.

5.    Herrod, through his position as manager of Alkemi, was duly terminated as manager of CAPCS in accordance with the terms and provisions of Section 3.5(j) of the Limited Liability Company Agreement of CAPCS. Thus he has neither been oppressed nor squeezed out in that regard.

6.    The ownership interest of Herrod in CAPCS has neither been terminated nor altered; thus there has been no squeeze out or oppression with respect thereto.

7.    Herrod abandoned his position as CEO of PPI. His ownership interest in PPI has not been terminated or altered. Thus he has been neither squeezed out nor oppressed in any manner with respect to PPI.

8.    CD was duly terminated as manager of Millbrook and Chantilly in accordance with the terms and provisions of Section 4.3(c) of the Limited Liability Company Agreements of Chantilly and Millbrook. Thus, it has neither been oppressed nor squeezed out as alleged in this claim.

9.    These defendants are not guilty of oppression or squeeze out as alleged in Claim 1 of the Amended Complaint.

## FOURTH DEFENSE-MISREPRESENTATION

1.     Brobst, Muller and Wooldridge affirmatively assert that they have made no misrepresentation of any nature to CD or Herrod as set out in Claim 2 of the Amended complaint.

2.     The allegations of Claim 2 fail to meet the pleading requirements of Rule 9(b) *Federal Rules of Civil Procedure* and are thus due to be dismissed.

3.     While specifically denying any misrepresentation on their part, the alleged reliance of either CD or Herrod was unreasonable as a matter of law.

4.     These defendants are not guilty of misrepresentation.

## FIFTH DEFENSE-SUPPRESSION

1.     Brobst, Muller and Wooldridge deny any act of suppression set out in Claim 3.

2.     They deny that any legal relationship existed between these defendants and Herrod which would obligate them to communicate any fact beyond those communicated to Herrod by these defendants.

3.     They deny any legal relationship existed between these defendants and CD which would obligate them to communicate any fact to CD beyond those which they did communicate.

4.     They are not guilty of suppression

## SIXTH DEFENSE-BREACH OF CONTRACT CLAIM 4

1.     Neither Herrod nor CD had any contract of any nature with Brobst, Muller and Wooldridge.

2.     Brobst, Muller and Wooldridge were not parties to the operating agreements referred to in Claim 4.

3.      To the extent that Herrod claims or contends a breach of the Management Agreement between CAPCS and Alkemi, such claim is governed by the terms and provisions of the arbitration provisions of the Management Agreement, and this Court is without jurisdiction to consider such claims.

4.      To the extent that Herrod had any contract with these defendants, any breaches thereof were on the part of Herrod.

5.      These defendants had no contracts with Herrod and therefor committed no breaches as alleged.

6.      They are not guilty of the claims set out in Claim 4.

## SEVENTH DEFENSE-BREACH OF CONTRACT CLAIM 5

1.      The operating agreements of Millbrook and Chantilly were not breached by these defendants.

2.      Any breaches of the operating agreements of Chantilly and Millbrook were on the part of CD acting by and through Herrod.

4.      They are not guilty of the matters set out in Claim 5.

## EIGHTH DEFENSE-BREACH OF EMPLOYMRNT CONTRACT CLAIM 6

1.      Herrod was an employee at will of PPI.

2.      Herrod abandoned his duties as CEO of PPI.

3.      Herrod failed and refused to perform his duties as CEO of PPI.

4.      PPI did not squeeze out Herrod.

5.      Herrod, as an employee at will, whose employment was never terminated by PPI, has no claim for breach of employment or squeeze out as set out in Claim 6.

6.      PPI is not guilty of the matters set out in Claim 6.

7.      Herrod breached his employment agreement with PPI.

## NINTH DEFENSE-CLAIM 7

1.      Claim 7 states no claim nor seeks any relief against these defendants.

## TENTH DEFENSE-CLAIM 8

1.      They deny all allegations of Claim 8.

2.      They are not guilty of the matters set out in Claim 8.

3.      Claim 8 fails to plead the existence of a civil conspiracy with that degree of particularity required to state a claim; thus, it is due to be dismissed.

## ELEVENTH DEFENSE

1.      Defendants aver that the Complaint fails to state a claim upon which punitive damages may be awarded to cross-claimants.

2.      Defendants aver that any award of punitive damages to them in this case would be violative of the constitutional safeguards provided to defendants under the Constitution of the State of Alabama.

3.      Defendants aver that any award of punitive damages to the plaintiffs in this case would be violative of the constitutional safeguards provided to defendants under the Constitution of the United States of America.

4.      Defendants aver that any award of punitive damages to the plaintiffs in this case would be violative of the constitutional safeguards provided to the defendants under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States in that the determination of punitive damages under Alabama law is vague, is not based upon any objective standards, is in fact standardless, and is not rationally related to legitimate government interests.

5.     Defendants aver that any award of punitive damages to the plaintiffs in this case would be violative of Article I, Section 6, of the Constitution of the State of Alabama which provides that no person shall be deprived of life, liberty, or property except by due process of law, in that punitive damages are vague and are not rationally related to legitimate government interests.

6.     Defendants aver that any award of punitive damages to the claimants in this case would be violative of the procedural safeguards provided to defendants under the Sixth Amendment to the Constitution of the United States in that punitive damages are penal in nature, and consequently, defendants are entitled to the same procedural safeguards accorded to criminal defendants.

7.     It is violative of the self-incrimination clause of the Fifth Amendment to the Constitution of the United States of America to impose against these defendants punitive damages, which are penal in nature yet compel defendants to disclose documents and evidence.

8.     It is violative of the self-incrimination clause of Article I, Section 6, of the Constitution of the State of Alabama to impose against these defendants punitive damages, which are penal in nature, yet compel defendants to disclose documents and evidence.

9.     Plaintiffs' claims of punitive damages violate the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the Constitution of the United States, on the following grounds:

a)     It is a violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution to impose punitive damages, which are penal in nature, against a civil defendant upon the claimants satisfying a burden of proof which is

less than the "beyond a reasonable doubt" burden of proof required in criminal cases;

b)   The procedures pursuant to which punitive damages are awarded fail to provide a reasonable limit or, the amount of the award against defendants, which thereby violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

c)   The procedures pursuant to which punitive damages are awarded fail to provide specific standards for the amount of the award of punitive damages which thereby violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

d)   The procedures pursuant to which punitive damages are awarded result in the imposition of different penalties for the same or similar acts and, thus, violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

e)   The procedures pursuant to which punitive damages are awarded permit the imposition of punitive damages in excess of the maximum criminal fine for the same or similar conduct, which thereby infringes the Due Process Clause of the Fifth and Fourteenth Amendments and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; and

f)   The procedures pursuant to which punitive damages are awarded may result in the award of joint and several judgments against multiple defendants for different alleged acts of wrongdoing, which

infringes the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution.

10. Plaintiffs' claim of punitive damages violates the Due Process Clause of Article I, Section 6, of the Constitution of Alabama, on the following grounds:

a) It is a violation of the Due Process Clause to impose punitive damages, which are penal in nature, upon a civil defendant upon the plaintiffs satisfying a burden of proof less than the "beyond a reasonable doubt" burden of proof required in criminal cases;

b) The procedures pursuant to which punitive damages are awarded fail to provide a limit on the amount of the award against these defendants;

c) The procedures pursuant to which punitive damages are awarded are unconstitutionally vague;

d) The procedures pursuant to which punitive damages are awarded fail to provide specific standards for the amount of the award of punitive damages;

e) The award of punitive damages in this case would constitute a deprivation of property without due process of law; and

f) The procedures pursuant to which punitive damages are awarded fail to provide a limit on the amount of the award against these defendants.

11.    An award of punitive damages to the claimants in this action would constitute a deprivation of property without due process of law required under the Fifth and Fourteenth Amendments of the United States Constitution.

12.    The Complaint fails to state a claim for punitive damages under <u>Alabama Code</u> §§ 6-11-20 to 6-11-30 (1975) and is barred.

13.    It is violative of the self-incrimination clause of Article I, Section 6, of the Constitution of the State of Alabama to impose against these defendants punitive damages, which are penal in nature, yet compel defendants to disclose evidence.

## COUNTER COMPLAINT ON BEHALF OF COUNTER-CLAIM PLAINTIFFS
## PPI, MULLER, BROBST AND WOOLDRIDGE

Comes Now Defendant/Counter-Claim/Third-Party Plaintiffs Primary Physicians, Inc., f/k/a PriMed Physicians Inc. ("PPI"), Muller, Brobst, and Wooldridge (collectively "Counter-Claim Plaintiffs") and state their counter/third-party claims against the realigned Plaintiffs and Third-Party Alkemi Management, LLC, as follows:

## PARTIES

**1.**   Counter-Claim Defendant Joseph Herrod ("Herrod") is the former CEO of PPI, the majority owner of Alkemi Management, LLC ("Alkemi), and a part owner of Counter-Claim Defendant Caesarea Development, LLP ("Caesarea Development").

**2.**   Counter-Claim Defendant Herrod is a resident of Florida and a citizen of Florida for diversity purposes.

**3.**   Counter-Claim Defendant Caesarea Development is a Delaware limited liability partnership whose partners are Joseph L. Herrod and Reynold Yordy.  Caesarea Development is a citizen of Florida and Tennessee for diversity jurisdiction purposes.

**4.**   Third-Party Defendant Alkemi Management, LLC ("Alkemi"), is a Florida limited liability company with Joseph Herrod and Reynold Yordy as its members. Though the Counter-Claim Plaintiffs claim they were inappropriately ousted as members and thus the ouster was ineffective, Alkemi is a citizen of Florida and Tennessee for diversity purposes.

<u>**JURISDICTION AND VENUE**</u>

**5.**   This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 and § 1367.

<u>**FACTUAL BACKGROUND**</u>

**6.**   Herrod was employed as CEO of PPI from 2010 to 2014. Herrod and PPI executed an Employment Agreement, attached as Exhibit A, which controlled the terms of his employment.

**7.**   At the time Herrod was hired, PPI had a cash reserve of approximately $3 million.

**8.**   Herrod, Brobst, Muller and Wooldridge each own 25% of the shares of PPI.

**9.**   In his role as CEO of PPI, Herrod was responsible for the management of the non-medical aspects of PPI's business.

**10.**   In December 2013, Baptist Health Montgomery, PPI's landlord gave notice that it would not renew PPI's leases.  The fact that the leases were ending was known to Herrod since he negotiated the leases.

**11.**   Despite these notices, Herrod failed to take any action to either negotiate with Baptist Health Montgomery or to secure other locations for operating PPI.

**12.**   Due to the immediate need to move facilities, PPI was placed in a difficult financial situation.

**13.**   Herrod proposed a joint venture with Jackson Hospital.

**14.**  This joint venture came to fruition in late September, 2014, with the formation of Central Alabama Primary Care Specialists, LLC ("CAPCS").

**15.**  Initially, PPI owned 71.6% of CAPCS, and Defendant Jackson Health, Inc., owned 28.4% of CAPCS.

**16.**  Contemporaneously, Herrod created Alkemi to manage CAPCS.

**17.**  Despite his obligations under his employment agreement with PPI and the management agreement with CAPCS, Herrod failed to perform his duties as Manager of CAPCS and as CEO of PPI from October 1, 2014, through December 31, 2014.

**18.**  In December, 2014, Herrod admitted he had taken that time to pursue other endeavors outside of CAPCS, and derivatively PPI, for Alkemi.

**19.**  At the same time, PPI, Brobst, Muller and Wooldridge learned that CAPCS was losing money.

**20.**  This was contrary to previous assertions by Herrod that PPI was cash positive going into the Fall of 2014.

**21.**  At that time, the Counter-Claim Plaintiffs began investigating Herrod's activities as CEO of PPI and as manager of CAPCS through Alkemi.

**22.**  Though not a full recitation of the grossly negligent and intentional acts of Herrod, the Counter-Claim Defendants discovered that:

**a.**  Throughout his employment with PPI, Herrod used funds of PPI, without permission of the Board, to pay for personal expenses incurred by himself and his family.

**b.**  Contrary to Section 6(b) of Herrod's Employment Agreement which required him to devote his full time and attention to the business affairs of PPI and further prohibited him from engaging in any other business activities for himself or on behalf of any third party during the

term of the Employment Agreement, except as authorized in writing by the Board, Herrod performed services on behalf of Alkemi, and/or Alkemi Management Company, Inc., a Delaware corporation, without the prior written consent of the Board.

 **c.** Contrary to Section 6(b) of the Employment Agreement which required Herrod to devote his full time and attention to the business affairs of PPI and further prohibited him from engaging in any other business activities for himself or on behalf of any third party during the term of the Employment Agreement, except as authorized in writing by the Board, he performed services on behalf of Caesarea Development, Inc, without the prior written consent of the Board.

 **d.** Contrary to Section 6(b) of Herrod's Employment Agreement which required Herrod to act in the best interest of PPI, he used funds to pay personal expenses for himself and his family.

 **e.** Herrod failed to provide a requisite fair market value validation required under the Management Agreement with CAPCS. Herrod's failure to comply with the terms of the Management Agreement was in direct conflict with the interest of CAPCS and ultimately impacted PPI's investment in CAPCS.

 **f.** Herrod fraudulently misrepresented and suppressed to PPI and CAPCS material facts relating to CAPCS.  In particular, at approximately 11:10 p.m. on January 15, 2015, Herrod reported to the Board and to the CAPCS Board of Advisors (the "CAPCS Board") that a payment of $165,000 was made to Alkemi, when in fact on the same day a payment of $195,000 was actually made to Alkemi.

 **g.** Herrod gave himself a salary during the period of September, 2014, to January, 2015, from PPI and continued to accept management fees for Alkemi from CAPCS.

**h.**   Herrod routinely paid himself monthly personal expenses above the limit allowed in Section 4.2 of the Management Agreement between Alkemi and CAPCS and in derivation of Section 6(b) of the PPI Employment Agreement.

**i.**   Despite restrictions under Section 10(a)(i) of the Employment Agreement with PPI, Herrod personally provided advice and services to Alkemi and Caesarea Development and caused other employees of PPI to perform services for those entities.

**j.**   Despite restrictions under Section 10(b) of the Employment Agreement with PPI prohibiting Herrod from hiring, recruiting, or engaging an employee or former employee of PPI, Herrod recruited, engaged, and/or hired numerous employees of PPI to work for Alkemi and/or Caesarea Development.

**k.**   Despite restrictions under Section 23 of the Employment Agreement with PPI which required Herrod to cooperate with "any internal investigation or administrative, regulatory or judicial proceeding as reasonably requested," Herrod abandoned his corporate responsibility in the midst of several ongoing EEOC investigations and cases.  This included failing to file insurance claims as was his duty.

**l.**   Despite restrictions under Section 24 of the Employment Agreement with PPI, which prohibited Herrod accepting any investment opportunities that relate to the business of PPI during his employment, Herrod invested in Alkemi.

**m.**   Herrod, without reasonable justification or board approval, transferred substantial funds from PPI to entities he controlled over the course of his employment.

**n.**   Herrod similarly transferred substantial funds from PPI to Caesarea Development over the course of his employment.

**o.** Despite Section 24 of the Employment Agreement, which prohibited Herrod from accepting investment opportunities that relate to the business of PPI during his employment, Herrod caused Alkemi to conduct business which could and should have been conducted by PPI. Furthermore, Alkemi and other persons controlled by Herrod obtained copyrights, trademarks, and/or other intellectual property rights with respect to logos and trade names used by PPI.

**p.** Herrod transferred assets of PPI and CAPCS to other entities without approval by the board of either organization.  These transfers included the transfer of money, software, servers, patient information, intellectual property, other property, and employees to Alkemi and Caesarea Development.

**q.** Herrod delivered conflicting financial information to PPI and CAPCS with respect to the performance of PPI in 2014.  In particular, Herrod presented a financial statement to the PPI Shareholders showing a profit of approximately $250,000 year-to-date in September, but in January, 2015, Herrod produced financials that showed PPI had a loss of $1.8 million.

**r.** During the above-referenced time period, Herrod structured a $2.4 million annual management fee to a company of which he was a majority member (Alkemi), he increased his pay as an employee of PPI from $150,000 to an amount in excess of $330,000, and then he used Alkemi's funds for personal purposes.

**s.** Herrod mismanaged and misled the Board of PPI, the investors in CAPCS, and the Board of Advisors of CAPCS with regard to the implementation and ownership of technology, computer hardware, and software used by PPI and CAPCS which were not needed.

**t.** Herrod also failed to take advantage of federal subsidies relating to electronic medical records ("EMRs"), and these actions subjected PPI and/or CAPCS to penalties for failing to comply with federal EMR mandates.

**u.**  Herrod terminated the use of certain software, telling the Board of Advisors that the software could no longer be supported.  However, such computer hardware and software were being supported.

**v.**  Herrod caused PPI and CAPCS servers to be moved from Montgomery, Alabama, to Nashville, Tennessee. Herrod then restricted access to the servers. This was done to leverage a payment of Alkemi's management fee. These actions caused irreparable damage to PPI's and CAPCS's ability to service its patients, to bill for services provided, and has injured the PPI's and CAPCS's reputations, in addition to causing direct economic harm.

**w.**  Herrod failed to provide PPI and CAPCS bankers with financial statements for a period of at least two (2) years.

**x.**  Herrod failed to properly pay taxes and vendors as they came due.

**y.**  Herrod failed to pay premiums for professional liability insurance which resulted in a cancellation of the insurance on December 29, 2014.

**z.**  Herrod, though withholding 401k contributions from employees' paychecks in 2014, failed to contribute these funds timely to the employees' retirement plan.

**aa.** During this time period, Herrod diverted approximately $600,000 from PPI and/or CAPCS due to Alkemi's management fee.

**bb.** Herrod also represented to appraisers for Jackson Hospital that a valuation of PPI's assets and earnings should be increased by $450,000 because the computer system of PPI counted certain reductions from the payees twice, resulting in a reduction of $450,000 to the earnings of PPI.  Herrod failed to report this event to the Board.

**cc.** Herrod unilaterally reduced the pay of doctors in violation of their contractual relationships with PPI and CAPCS and without the approval of the Board of PPI or the Board of Advisors of CAPCS.

**dd.** Herrod unilaterally caused PPI and CAPCS to loan funds to Alkemi and Caesarea Development and other persons controlled by Herrod without the written approval of the Board of PPI or CAPCS after full disclosure.

**ee.** Herrod established a Women's Wellness Center and a MedSpa Clinic without the written approval of the Board of PPI and in turn failed to properly manage these activities.

**ff.** Herrod transferred corporate assets outside the ordinary course of business to Alkemi, Caesarea Development, and other persons under his control or direction, including, without limitation, the furniture, which was previously in Herrod's office at PPI and valued at approximately $300,000, the AllMed brand, the URNEXT software, CAPCS's server and related software, and other intellectual property.

**gg.** Herrod similarly represented to PPI's members and Brobst, Muller and Wooldridge that their personal guarantees at Sterling Bank would be released and that they would each receive a distribution in the approximate amount of $700,000 if they entered the joint venture that came to be known as CAPCS.

**hh.** Herrod intentionally moved to separate PPI's business away from Baptist Venture, Inc., without locating adequate facilities before taking such action or at least failing to recognize the lease term was expiring and that new facilities were required. These actions cost PPI a significant amount of money, and when such actions were challenged, Herrod took intentional actions to deny Baptist Ventures the right to take over the leased premises and interfere with the use of the property.

**ii.** Herrod incurred numerous frivolous and unjustifiable expenditures at the Corporation's expense including maintaining a Black American Express card that called for a $7,500 initiation fee and a $2,500 annual fee paid. These were paid by PPI.

**23.** By January, 2015, many of the above-referenced actions of Herrod had taken PPI from a cash surplus with minimal debt, if any, to $2.2 million in debt and no reserves.

**24.** The amalgamation of these actions forced the Board of Advisors of CAPCS to terminate Alkemi's contract.

**25.** Herrod's grossly negligent and intentional actions against the Counter-Claim Plaintiffs continued after the termination of the contract.

**26.** Specifically, Herrod improperly restricted access to PPI/CAPCS' server which included all personal health information for PPI and CAPCS' patients and all emails of PPI and CAPCS.

**27.** This action forced CAPCS to file an injunction in Tennessee, which was granted, and Alkemi and Herrod were forced to return the server.

## CAUSES OF ACTION

### COUNT 1 - Fraudulent Inducement and Misrepresentation

**28.** Counter-Claim Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as if set forth herein.

**29.** Herrod misrepresented to each Muller, Brobst and Wooldridge that he would manage PPI, Alkemi, and CAPCS and their monies in a prudent manner to benefit PPI, Alkemi, and CAPCS, fully knowing he had no intention to manage them or the monies prudently, in order to induce Muller, Brobst and Wooldridge to give him money and control.

**30.** Herrod made those representations to Counter-Claim Plaintiffs in order to obtain company monies to divert to himself.

**31.**  Herrod reaffirmed these fraudulent representations through the relevant period.

**32.**  Muller, Brobst and Wooldridge justifiably relied on Herrod's representations, and as a result, each has personally lost money, time and business relationships.

**33.**  Had Muller, Brobst, or Wooldridge known Herrod was materially misrepresenting his intended actions, they would not have entrusted Herrod with their monies or control of their property.

**34.**  By a direct result of Herrod's fraudulent inducements, all Defendants have suffered losses.

PPI, Muller, Brobst and Wooldridge seek actual damages to be proven at trial, punitive damages, attorneys' fees and court costs, and any other relief this Court deem appropriate.

## COUNT 2 - Breach of Contract of Employment Agreement

**35.**  Counter-Claim Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as if set forth herein.

**36.**  Herrod and Counter-Claim Plaintiff PPI entered into an Employment Agreement.  PPI performed all, or substantially all, of the essential obligations which the contract required it to do. All conditions required by the contract for Herrod's performance had occurred, and yet Herrod intentionally failed to perform his contractual duties.

**37.**  As a result of Herrod's breach of contract, PPI and the shares of Muller, Brobst, and Wooldridge in PPI were harmed. Each Counter-Claim Plaintiff has been directly and substantially injured by reason of Herrod's intentional breach of his contractual duties to the Counter-Claim Plaintiffs. Counter-Claim Plaintiffs seek damages and other relief, in an amount to be proven at trial.

PPI, Muller, Brobst and Wooldridge seek actual damages to be proven at trial, punitive damages, attorneys' fees and court costs, and any other relief this Court deem appropriate.

### COUNT 3 - Breach of Contract of Management Agreement

**38.**  Counter-Claim Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as if set forth herein.

**39.**  Herrod, through Alkemi, and CAPCS entered into a management contract.  PPI, as the majority owner of CAPCS, performed all, or substantially all, of the essential obligations which the contract required.  All conditions required by the contract for Herrod's performance had occurred, and yet Herrod intentionally failed to perform his contractual duties.

**40.**  As a result of Herrod's breach of contract, PPI, Muller, Brobst and Wooldridge were harmed. Each Counter-Claim Plaintiff has been directly and substantially injured by reason of Herrod's intentional breach of his contractual duties to each Counter-Claim Plaintiff. Counter-Claim Plaintiffs seek damages and other relief, in an amount to be proven at trial.

PPI, Muller, Brobst and Wooldridge seek actual damages to be proven at trial, punitive damages, attorneys' fees and court costs, and any other relief this Court deem appropriate.

### COUNT 4 - Breach of Fiduciary Duty

**41.**  Counter-Claim Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as if set forth herein.

**42.**  Herrod owes each Counter-Claim Plaintiff fiduciary obligations. By reason of his fiduciary relationship, he owed and owes each Counter-Claim Plaintiff the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, and supervision.

**43.**  Herrod violated and breached his fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, and supervision.

**44.** The above referenced actions were not a good faith exercise of prudent business judgment to protect and promote each Counter-Claim Plaintiff's share in the entities.

**45.** As a direct and proximate result of the Counter-Claim Defendants' breaches of their fiduciary duties, Counter-Claim Defendants have caused, and will continue to cause, each Counter-Claim Plaintiff to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to each Counter-Claim Plaintiff's reputation, business and goodwill.

**46.** Each Counter-Claim Plaintiff has been directly and substantially injured by reason of Herrod's intentional breach and/or reckless disregard of his fiduciary duties to the Counter-Claim Plaintiffs. Counter-Claim Plaintiffs, with respect to the damages done to each of their individual shares, seek damages and other relief, in an amount to be proven at trial.

PPI, Muller, Brobst and Wooldridge seek actual damages to be proven at trial, punitive damages, attorneys' fees and court costs, and any other relief this Court deem appropriate.

## COUNT 5 - Failure to Prudently Manage Assets

**47.** Counter-Claim Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

**48.** By his actions alleged herein, Herrod abandoned and abdicated his responsibilities and fiduciary duties with regard to prudently managing the assets and business of each Counter-Claim Plaintiff's share in Alkemi and PPI in a manner consistent with the operations of a company.

**49.** As a direct and proximate result of Herrod's gross mismanagement and breaches of duty alleged herein, each Counter-Claim Plaintiff has sustained and will continue to sustain significant damages.

**50.**   As a result of the misconduct and breaches of duty alleged herein, Herrod is liable to each Counter-Claim Plaintiff.

PPI, Muller, Brobst and Wooldridge seek actual damages to be proven at trial, punitive damages, attorneys' fees and court costs, and any other relief this Court deem appropriate.

### COUNT 6 - Waste

**51.**   Counter-Claim Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

**52.**   By engaging in the wrongdoing alleged herein, Herrod intentionally wasted corporate assets by, among other things, improperly allocating assets, improperly managing Alkemi, CAPCS, and PPI, and intentionally converting third-party assets, damaging the goodwill and reputation of the each Counter-Claim Plaintiff's membership interest, and exposing each Counter-Claim Plaintiff to civil and criminal liability, for which Herrod is liable.

**53.**   As a direct and proximate result of Herrod's wrongful conduct, each Counter-Claim Plaintiff has suffered damages in an amount to be proven at trial.

PPI, Muller, Brobst and Wooldridge seek actual damages to be proven at trial, punitive damages, attorneys' fees and court costs, and any other relief this Court deem appropriate.

### COUNT 7 - Unjust Enrichment

**54.**   Counter-Claim Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

**55.**   As a result of the actions set forth herein, Herrod has been and will continue to be unjustly enriched at the expense of and to the detriment of each Counter-Claim Plaintiff.

**56.**   Accordingly, this Court should order Herrod to disgorge all profits, benefits and other compensation obtained from his wrongful conduct and fiduciary breaches described herein.

PPI, Muller, Brobst and Wooldridge seek actual damages to be proven at trial, punitive damages, attorneys' fees and court costs, and any other relief this Court deem appropriate.

### Count 8 – Gross Negligence

**57.**  Counter-Claim Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

**58.**  As a result of the actions set forth herein, Herrod has been and will continue to commit grossly negligent acts at the expense of and to the detriment of each Counter-Claim Plaintiff.

**59.**  As a direct and proximate result of Counter-Claim Defendants' wrongful conduct, the Counter-Claim Plaintiffs have has suffered damages in an amount to be proven at trial.

PPI, Muller, Brobst and Wooldridge seek actual damages to be proven at trial, punitive damages, attorneys' fees and court costs, and any other relief this Court deem appropriate.

### Count 9 – Suppression

**60.**  Counter-Claim Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

**61.**  As a result of the actions set forth herein, Herrod has been and will continue to commit suppression at the expense of and to the detriment of each Counter-Claim Plaintiff.

**62.**  As a direct and proximate result of Counter-Claim Defendants' wrongful conduct, the Counter-Claim Plaintiffs have suffered damages in an amount to be proven at trial.

PPI, Muller, Brobst and Wooldridge seek actual damages to be proven at trial, punitive damages, attorneys' fees and court costs, and any other relief this Court deem appropriate.

### Count 10 – Conversion

**63.**  Counter-Claim Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

**64.** As a result of the actions set forth herein, Herrod has committed conversion at the expense of and to the detriment of each Counter-Claim Plaintiff.

**65.** By engaging in the wrongdoing alleged herein, Herrod intentionally converted corporate assets and third-party assets for personal use.

**66.** As a direct and proximate result of Counter-Claim Defendants' wrongful conduct, the Counter-Claim Plaintiffs have suffered damages in an amount to be proven at trial.

PPI, Muller, Brobst and Wooldridge seek actual damages to be proven at trial, punitive damages, attorneys' fees and court costs, and any other relief this Court deem appropriate.

WHEREFORE PREMISES considered, the Counter-Claim Plaintiffs ask this Court to find in their favor on all counts and to award damages the form of compensatory, equitable, punitive, attorneys' fees and costs and any other relief this Court deems proper.


BALL, BALL, MATTHEWS & NOVAK, P.A.


By:    /s/Tabor R. Novak, Jr.
       TABOR R. NOVAK, JR. – NOV001
       As Attorneys for Caesarea-Millbrook, LLC,
       Caesarea-Chantilly, LLC, Jackson Health, Inc.,
       Donald P. Brobst, M.D., C. Dennis Wooldridge,
       M.D. and A. Chandler Muller, Jackson Hospital &
       Clinic and PPI

OF COUNSEL:
BALL, BALL, MATTHEWS & NOVAK, P.A.
9045 Dexter Avenue, Ste. 9045 (36104)
P.O. Box 2148
Montgomery, Alabama 36102-2148
334-387-7680 (t)
334-387-3222 (f)
tnovak@ball-ball.com

Royal Dumas, Esq.
GILPIN GIVHAN
P.O. Drawer 4540
Montgomery, AL 36103
rdumas@gilpingivhan.com

## CERTIFICATE OF SERVICE

     I hereby certify that the foregoing has been served upon counsel having appeared herein by this Court's CM/ECF electronic filing system or, by ordinary mail properly addressed and postage prepaid on the following this 29th day of June, 2015:

Bruce F. Rogers
John W. Clark, IV
Bainbridge, Mims, Rogers & Smith, LLP
P.O. Box 530886
Birmingham, AL 35253

Ben Wilson
Grant Sexton
Rushton, Stakely, Johnston & Garrett, P.A.
P. O. Box 270
Montgomery, AL 36101

                           /s/Tabor R. Novak, Jr.